T. B. HANLEY, Trustee, Appellee, v. FIDELITY & CASUALTY COMPANY, Appellant.

**APPEAL AND ERROR:** Parties Entitled to Allege Error—Invited
1   Error—Requesting Instructions, etc.—Effect.   Requesting in-

structions or special findings on disputed questions of fact is a
concession that the evidence is such as to justify the giving of
such instructions and the submission of such questions, and
precludes a subsequent change of front and an insistence *that
the evidence is insufficient to support the verdict or findings
returned.*

EVANS, J., withholds judgment on this point.

**APPEAL AND ERROR:** Parties Entitled to Allege Error—Estop-
pel by Asking Instructions, etc.—Avoidance of Estoppel.
Whether unsuccessful insistence, at all proper stages of the
trial, that all questions arising on the record are questions of
law and not of fact, would arm the party with right to ask,
under protest, instructions and special findings, without forfeit-
ing his right to insist on the insufficiency of the evidence to
support a verdict or finding adverse to the party, *quaere.*

**TRIAL:** Direction of Verdict—Overcoming Prima-Facie Case. Prin-
ciple recognized that seldom may a defense be made so com-
plete and impreguable as to overcome, *as a matter of law,* an
already prima-facie made case for recovery.

**INSURANCE:** Accident Insurance—"Accident" Defined. An "ac-
cident," within the meaning of a policy insuring against acci-
dent, is an event happening without any human agency, or, if
happening through human agency, an event which, under the
circumstances, is unusual and unexpected to the person to whom
it happened. Applied to the case of one who, in fastening a
board on a box, suffered an injury, by the screw driver's unex-
pectedly slipping from the screw head and from there to the
floor, causing the operator to fall heavily against the head of
the tool.

**APPEAL AND ERROR:** Harmless Error—Jury Negativing Fact on
Which Refused Instruction is Based. When, at defendant's re-
quest, the jury passes on the question whether a deceased was
suffering from any disease that contributed to his death, and
finds in the negative, defendant suffers no prejudice by being
refused an instruction which directed the jury as to the rule
to follow if it found it equally consistent that death might have
been caused by accident or by disease.

**PLEADING:** Amendments—Permissible in Order to Cure Careless
Oversight. An amendment may be permitted in order to cure
an oversight due to the negligence of the pleader. Applied

where an action was brought on a policy of insurance which, by its terms, had expired, the amendment alleging a renewal.

**TRIAL: Instructions—Cautionary—Limiting Purpose of Testimony.** Error does not necessarily follow a refusal to caution the jury as to the purpose for which certain evidence was received. It will ordinarily be presumed that the jury considered the testimony for the *professed* purpose for which it was offered, and for no other purpose.

**TRIAL: Instructions—Province of Jury—Materiality of Statements of Hypothetical Question.** An instruction is properly refused which permits the jury to say what are and what are not the material and important features of the hypothesis embodied in a given question.

**INSURANCE: Proof of Loss—Waiver—Evidence.** A waiver of formal proofs of death is shown by evidence that, promptly following the death of deceased, the beneficiary repeatedly requested the company to furnish the necessary blanks, and was refused, the company taking the exclusive position that deceased died of disease and not of accident, as provided in the policy.

**NEW TRIAL: Newly Discovered Evidence—Diligence.** The findings of the trial court on conflicting affidavits as to diligence in discovering new evidence, have the force and effect of the verdict of a jury.

*Appeal from Polk District Court.*—W. H. McHENRY, Judge.

SATURDAY, JANUARY 20, 1917.

REHEARING DENIED TUESDAY, JUNE 26, 1917.

THE plaintiff, as trustee for Edith S. Hatfield, administratrix of the estate of William J. Hatfield, deceased, instituted this action at law upon a benefit certificate of accident insurance issued to said William J. Hatfield in his lifetime, of which certificate the said Edith S. Hatfield is the sole beneficiary. The defendant by its answer admitted the membership of William J. Hatfield and the issuance to him of the certificate sued upon, but denied that he was injured or came to his death in any manner or from any cause against which the association had undertaken

to insure him, and averred that his death was the result of disease and bodily infirmity. There was a trial to a jury, resulting in verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*Sullivan & Sullivan,* for appellant.

*Dowell, McLennan & Zeuch, Thomas B. Hanley,* and *Parker, Parrish & Miller,* for appellee.

WEAVER, J.—The defendant is an accident insurance company, having its principal office in the city of New York. On July 12, 1911, said company issued to William J. Hatfield, a resident of Portland, Oregon, a policy or benefit certificate, insuring him, among other risks, against bodily injury sustained at any time during the term of one year "through accidental means, and resulting directly, independently and exclusively of all other causes in death." This policy was extended or renewed at the end of the year, and was in force on June 14, 1913, when Hatfield died. Within a few days after his death, the widow notified the company thereof, and of her claim that such death was the result of accident, and asked to be furnished blanks upon which to prepare formal proofs of loss. After some correspondence, the company declined to furnish the blanks and refused to admit any liability upon its contract, claiming that the death of the insured did not result from accidental injury within the meaning of the policy. The widow, having been appointed administratrix of the estate of the deceased, and acting under authority of the court, appointed the plaintiff herein her trustee for the collection of said insurance, who thereafter instituted this action for that purpose.

The petition recites the issuance of the policy and its maintenance in force until the death of the insured, as above stated, and alleges that his death resulted from bodily injury from external, violent and accidental means, in-

dependent of all other causes, which injury was occasioned in the following manner: The deceased was at his home, and, at the time in question, was engaged in attempting to fasten a board or false bottom on a small box standing on the floor of the room. In so doing, he made use of a ratchet screw driver. Having laid the board on the box and placed a screw in position to be driven through the board, deceased adjusted the tool for that purpose, and, while bending over it to bring his weight upon said tool and thus force the screw into place, the box tipped, and the point of the driver slipped from the screw, causing him to fall forward with his whole weight upon the upper end of said tool, which struck him in the breast, injuring him in such manner that he died on the same or following day. It is further alleged that due proofs of loss were furnished the defendant within one month after the death of the insured. By way of amendment, the plaintiff also pleads that defendant, having been duly notified of the death of the insured, and being requested to furnish blanks for formal proofs of loss, refused such request and denied all liability on account of such death, thereby waiving any other or further proofs, and is therefore estopped to plead or prove want of such proofs as a defense to this action.

The defendant does not deny the making of the contract sued upon, or that the same was still in force at the date of Hatfield's death, but does deny that such death was caused by or was the result of any accident or injury against which the deceased was insured. It also alleges affirmatively that the insured died from natural causes—disease and bodily infirmity.

The evidence on the part of plaintiff tends to show that deceased was a man of about 58 years of age, 5 feet 11 inches in height, and weighed 247 pounds. He was a traveling salesman, and had been engaged in that business for many years. He had returned home from one of his trips

but a short time before his death, and his wife testifies that he seemed to be in perfect health, and was making no complaint of any kind. On the day in question, he had been in the garden with his wife, gathering flowers, and later walked down town, where he procured the board and materials for fixing the box. Returning home, he proceeded with the work in a manner described by the witness as follows:

"He was leaning over the box like this, and you have to press on it hard to turn the screw, and he got over it with his whole weight, and when he had the screw driver pulled out, the box toppled over and threw the screw driver out of the head of the screw, and he fell against it with an awful thud. At the time, he held the head of the screw driver against his breast, as he pushed it down with the handle of the screw driver. Q. How was he pressing upon this? A. With his full weight, right over like this against it. He had put in three screws before he fell. After he fell, he was just crumpled up and could not get his breath, and just struggled like he was dying, and I thought he was. I stood on the other side, looking right towards him. He was standing on the opposite side of the box from the screw he was trying to drive in, and I stood right on this side, looking right at him, watching him doing it. I suppose I was 2½ feet away from him. After he fell, he was making an awful noise, struggling just like he could not get his breath at all, and we, the maid and I, grabbed him and dragged him to a chair, and he kept getting whiter and whiter, and I turned around to the telephone and called a doctor. During all this time, he seemed to be in most terrible pain and agony. His face was ashen pale and his lips were purple. The doctor came in about an hour. During this time, he was in awful agony, seemed to be in terrible agony, clawing at his breast, and this continued until the doctor gave him some medicine. The doc-

tor gave him some medicine, but it never eased him. He got so he did not groan so terribly, but never got easier after that, and died about 2 o'clock in the morning."

The wife appears to have been the only person present, at the time of the alleged injury, except a housemaid, Maggie Bell, who was not called as a witness by either party. Sometime during the following month, and about three weeks after burial, the body of the deceased was exhumed at the instance of the defendant, and a post mortem examination made by physicians. Upon the information alleged to have been obtained by means of this examination, the defense principally rests. Five physicians attending the autopsy made and signed a written report of their findings. Omitting therefrom details which do not appear to disclose any facts of material importance, we quote the following statement, descriptive of the heart and blood vessels:

"Heart and blood vessels: Clotted blood in pericardium probably from a puncture of the heart by the embalmer's trochar; such a puncture is present near the apex.

"Marked atheromatous condition of the entire thoracic aorta, with an atheromatous ulcer three eighths inch in diameter in the ascending portion. There is a blood clot between the coats of the arch of the aorta, and extending into the descending portion about eight inches in length in entire extent, and perhaps two thirds of the circumference of the vessel.

"Heart: Enlarged to nearly twice its normal size. Marked amount of fat distributed over its entire surface. Left ventricle markedly hypertrophied. Mitral valves markedly atheromatous, thickened and shortened. Aortic semilunar valves atheromatous. The coronary arteries show a marked degree of atheromatous change. There is blood diffused into the tissue of the base of the heart.

"Brain: No evidence of injury to brain. No evidence of apoplexy. Blood vessels at base are atheromatous.

"We, the undersigned, are of the opinion that the cause of death was a hemorrhage into the wall of the arch of the aorta. We also believe that the diagnosis of angina pectoris was justified by the autopsy findings."

If we understand the technical terms employed in the report, an "atheromatous condition" is one indicating a degenerative condition of the inner coat of the blood vessels, and a "hypertrophied" heart is one enlarged beyond its natural or normal proportions. Aside from the testimony of the undertaker to the effect that, in preparing the body for burial, he discovered no bruises or marks of injury, the evidence offered by the defendant consists entirely in the evidence of the physicians who united in the report of the autopsy, and another physician who was examined as an expert concerning the normal condition and appearance of the human heart and as to the result or effect of certain abnormal conditions. The witness last mentioned was asked and gave his opinion of the effect of a blow upon the breast or chest, and whether such a blow could result in the rupture of an aneurism or dilation of the aorta or large artery through which the heart supplies pure blood to the system. As witnesses on the stand, the several physicians attending the autopsy unite with a fair degree of unanimity in expressing the opinion stated in their report that the deceased died of angina pectoris. This term appears, however, to be one of somewhat indefinite significance, descriptive of the symptoms arising from a variety of causes. It may be due, says one of the defendant's expert witnesses, to aneurisms or tumors pressing on the organs or nerves in the mediastinal region, and to arterio sclerosis. Of the deceased, he says, "He was suffering from this group of symptoms which I call 'angina.'" This witness expresses his own opinion that Hatfield's death was from the effects of an aneurism of the aorta. The evidence also tends to show that the heart of the deceased was very considerably

enlarged; that his arteries showed a hardened or sclerotic condition, such as is frequently found in men advancing in age; and that the inner coating of the aorta and arteries showed atheromatous patches; and that, at one point in the aorta, there was an aneurism or dilation of that vessel. At this point, they say that there was a slight rupture in the inner coat of the aorta, through which the blood had made its way between the inner and outer coats, and, to use the physicians' phrase, had "dissected its way up and down," creating a condition to which they ascribe his death. In short, in the opinion of these witnesses, the abnormal conditions of the heart and blood vessels were of a character rendering the man liable to sudden death, a result which might have been precipitated by slight cause or mere ordinary exertion, or even in sleep, without any known external cause.

In rebuttal, the plaintiff introduced the evidence of a witness who qualified himself to speak as an expert. In reply to interrogatories put to him, he expressed the opinion that the effect of the injection of embalming fluid into the body of a deceased person is to render the arteries harder than normal; that nearly all men undergo a hardening of the arteries as age approaches, and that it is unusual to find a person over 50 or 60 years of age without some evidence of arterio sclerosis; that hypertrophy of the heart is not an uncommon condition of persons engaged in active life; that ordinarily a large man has a larger heart than one of smaller stature; and that the fidelity of a heart enlarged to one and a half or twice its normal size may last just as long as a heart of normal condition, provided the compensation does not give way from disease, extreme age or something of that kind. In answer to a hypothetical question embodying the alleged circumstances of the injury and death of the deceased and the alleged facts stated in the report of the autopsy, the witness was permitted to say

that, in his judgment, the blow received by the fall of the deceased upon the head of the screw driver was sufficient to produce the death of the insured, and that, in his opinion. such was the cause of the death. While admitting that a post mortem examination is or may be the most satisfactory method of arriving at the cause of death, the witness expressed the opinion that Hatfield's death was caused by the blow upon or in the vicinity of the solar plexus, producing a paralysis of the sympathetic nerves.

At the close of the evidence, there was no motion by either party for a directed verdict, and, after argument by counsel, the cause was submitted to the jury upon the evidence and the instructions given by the court for a general verdict upon the issues joined, and for answers to certain special interrogatories submitted at the request of the defendant. Later, the jury returned a verdict for plaintiff for the full amount of his claim, and to each special interrogatory, returned a finding favorable to the plaintiff. Judgment was entered on the verdict on February 19, 1915. On the 6th of March following, the time for filing motion having been extended, the defendant moved for a new trial, assigning as grounds therefor nearly 50 errors alleged to have been committed by the trial court in. its rulings and instructions, and alleging an entire want of sufficient evidence to sustain the verdict of the jury. Later, on April 3, 1915, defendant amended its motion, alleging the discovery of new evidence which it would be able to produce on another trial, and in support thereof filed affidavits. A resistance to the motion, also supported by affidavits, was filed on behalf of the plaintiff. The motion was denied, and error is also assigned upon this ruling.

1. APPEAL AND ERROR: parties entitled to allege error: invited error: requesting instructions, etc.: effect.

I. Consideration of the first proposition laid down in appellant's brief is rendered somewhat difficult from the

fact that counsel group together therein no less than 27 assignments of error. We think, however, that, taking them all together, they may be treated as raising the question of the sufficiency of the evidence to sustain the verdict and special findings returned by the jury.

Upon the record, as disclosed in the abstract, the defendant is not in position to rely upon this objection. Neither at the close of the evidence nor at the close of all the evidence did appellant move for a directed verdict, but proceeded to the argument and submission of the case in the usual way. Also, before the court had charged the jury on its own motion, appellant submitted requests for instructions to the jury upon: (1) The burden of proof; (2) the construction of the contract; (3) how the verdict would be affected by a finding that the death of the insured person was caused partly by accidental injury and partly by disease; (4) the effect of a finding that the theory of death by disease was equally consistent with that of death from accidental causes; (5) the effect upon the verdict to be returned if the deceased suffered a rupture of a blood vessel while engaged in a voluntary act; (6) the effect of a finding that the blood vessels of the deceased were in a weakened condition, and that, but for such condition, there would have been no rupture; (7) the effect to be given the proofs of death; (8) the rule to govern the consideration of expert testimony; (9) the definition of the word "accident;" and (10) the time or period covered by the policy. In addition to this, the defendant presented and asked the court to submit to the jury six special interrogatories, as follows:

"(1)   Did the plaintiff furnish proofs of death to the defendant within 60 days of the date of the death of William J. Hatfield?

"(2)   Did the defendant waive the furnishings of proofs of the death of William J. Hatfield?

"(3)   Was William J. Hatfield afflicted with any dis-

ease or weakness of his blood vessels on and prior to the 13th day of June, 1913?

"(3)    Was William J. Hatfield afflicted with any disease or weakness of his heart on and prior to the 13th day of June, 1913?

"(5)    Did the diseased and weakened condition of the blood vessels in the body of William J. Hatfield contribute to his death?

"(6)    Did the diseased and weakened condition of William J. Hatfield's heart contribute to his death?"

Several of the instructions so requested were incorporated, in substance, in the court's charge to the jury. Of the interrogatories so submitted at appellant's request, the first and second were answered in the affirmative, and each of the other four in the negative.

It is true that the requests for instructions were prefaced by the following proposed instruction:

"You are instructed that plaintiff is not entitled to recover in this case, and you should return a verdict for the defendant."

This does not direct the court's attention to any ground or reason upon which a directed verdict is asked, and is entirely insufficient to raise the question of the sufficiency of the evidence.   Moreover, when so asked in connection with a large number of other requests adopting the theory of the existence of jury questions, it may be presumed that the undisclosed ground of the first request was something other than an alleged insufficiency of the evidence.   In this connection, we may also note that, as the petition stood at the beginning of the trial, plaintiff had pleaded an insurance contract which, by its terms, had expired before the death of the insured, and had neglected to plead a renewal or extension of the term, and this defect was not remedied by amendment until the trial was near its close.   Had the trial gone to a submission without the amendment, a re-

covery for the plaintiff could not have been sustained. There is some indication in the requested instruction to which we have referred, and others which we have not quoted, that these requests had been prepared before the amendment to the petition, and with an eye to the issues as at first joined, rather than to the issues as they stood when the trial was completed.

Few rules are better settled than that a ruling by the trial court or the submission of a question of fact to the jury cannot be assigned as error by the party asking it. He cannot be heard to complain of the giving of an instruction requested by him, or of the giving of another which is in substance like the one so requested. *Renner v. Thornburg,* 111 Iowa 515; *Campbell v. Ormsby,* 65 Iowa 518; *Beaver v. City of Eagle Grove,* 116 Iowa 485; *Kinney v. McFaul,* 122 Iowa 452, 454; *Bryce v. Burlington, C. R. & N. R. Co.,* 128 Iowa 483.

So, too, when he asks an instruction to the jury, or a special finding upon any stated proposition of fact, it implies a concession upon his part that there is evidence to justify the giving of such instruction or submission of such question, and, if it result in a verdict or finding contrary to his wishes, he will not be permitted to change front and insist that there is no evidence to sustain it. The decisions to this effect are very numerous. For example, in *Cash v. Dennis,* 159 Iowa 18, 29, we said of the position taken by appellant:

"It is next urged that the court erred in submitting to the jury the question of testamentary capacity, appellant claiming that there was not sufficient evidence to justify the submission of this question to the jury; but it appears that the defendant made no motion to withdraw the consideration of this question from the jury, * * * but rather gave the court to understand that the appellant wished it submitted to the jury, for appellant submitted to

the court and asked the court to give instructions upon
this question, and asked that they be submitted to the jury;
and the instructions given by the court are substantially
the same as those asked by appellant. It is well settled
that appellant cannot complain now of the action of the
court in doing what appellant then asked the court to do."

In *Gordon v. Chicago, R. I. & P. R. Co.*, 154 Iowa 449,
among the reasons assigned by this court for denying the
appellant's contention that a finding of negligence had no
support in the testimony was the following:

"Moreover, the defendant asked instructions covering
this feature of the case, thus admitting that these were
questions of fact for the jury."

In *Light v. Chicago, M. & St. P. R. Co.*, 93 Iowa 83, 86,
it appearing that appellant had asked an instruction
which, though refused, was substantially given by the court
in its own charge, the court says:

"It will be observed that this instruction, which the
court refused to give, embraced all the acts of negligence
pleaded, and the very matter now complained of; hence,
having insisted by offering the instruction that it was cor-
rect, the defendant cannot now be heard to complain if the
court erroneously adopted its view, even though it be true
that thereby the court submitted a matter to the jury as to
which there was no evidence."

In *Spicer v. City of Webster City*, 118 Iowa 561, the
court submitted to the jury a special interrogatory whether
the city had actual notice of a defect in its street, and the
jury answered in the affirmative. On appeal, it was in-
sisted that the answer was without support in the evidence,
but we said:

"If this be conceded, appellant cannot complain, for
it requested an instruction, proper in form, which was fair-
ly embodied in the seventh and fourteenth paragraphs giv-
en, submitting this precise issue. A party may not lead the

court into the commission of error, and then make it a basis for reversal."

In the recent case of *Cheney v. Stevens,* 173 Iowa 288, we said that the objection that the verdict is unsupported by the evidence was unavailable to the appellant, for the reason that appellant requested the court to give the jury various instructions directing the jury upon the law bearing upon the issues of fact raised by both counts of the answer. This, we said, was tantamount to an admission in court that there was evidence for the jury upon both issues, and it is well settled that a party making such requests cannot thereafter insist that the record presents no jury question, and this is especially so whether the court either gives the instructions asked or embodies the substance thereof in its charge. See, also, *Evans v. Roberts,* 172 Iowa 653, 661; *Miller v. Harrison County,* 171 Iowa 270, 273. In *Murphy v. Cochran,* (Iowa) 134 N. W. 1085, it is said that a party having elected to submit a question as one of fact to a jury which returns a verdict against him, "cannot again change front and ask that the matter be determined in his favor as a matter of law." Again, in *Allison v. Jack,* 76 Iowa 205, 208, it is said:

"The pleadings show that the instructions are applicable to the issues, and, as plaintiff asked instructions which are applicable to evidence of the same character as the instructions in question contemplate, they cannot now claim that these instructions are not applicable to the evidence."

The same rule is observed in other jurisdictions. For example, it has been held that:

"When a question is submitted to the jury at the request of a party to a suit, he will not be heard to say that an adverse finding thereon is not sustained by sufficient evidence." *Chicago, B. & Q. R. Co. v. Johnston,* (Neb.) 95 N. W. 614.

And again:

"Without entering upon a criticism of the theory on which the cause was submitted to the jury, it is sufficient answer to defendant's objection to say that the instruction mentioned was given at its request, and it cannot now be heard to say that the finding of the jury on an issue submitted at its request is not sustained by sufficient evidence." *Chicago, R. I. & P. R. Co. v. Sizer*, (Neb.) 95 N. W. 498.

Says the Pennsylvania court:

"A party who solicits and obtains an instruction from the trial judge will not be permitted to allege here that there was no evidence to justify it." *Auburn B. & N. Works v. Schultz*, (Pa.) 22 Atl. 904.

See, also, *McDonald v. Minneapolis, St. P. & S. S. M. R. Co.*, (Mich.) 63 N. W. 966. In *Watson Cut Stone Co. v. Small*, (Ill.) 54 N. E. 995, the court, while expressing the view that the evidence upon several of the alleged acts of negligence was insufficient to sustain the judgment below, says:

"But, however that may be, we are of opinion this cannot now be urged as a cause for reversal, because appellant asked the thirty-second instruction upon the theory that it was not liable for any negligence charged, and the court gave at its instance several instructions in which is submitted to the jury the question of any and all negligence charged against it."

2. APPEAL AND ERROR: parties entitled to allege error: estoppel by asking instructions, etc.: avoidance of estoppel.

That the case before us falls clearly within the scope and reason of the rule of the authorities is clear, and we are not now called upon to define its limitations or the exceptions thereto, if any. It may well be that, where a party's timely objection to the sufficiency of the evidence has been overruled, and he has made unavailing efforts to have the matter treated as

one at law, and the question is being sent to the jury over his protest, a request by him for instructions in harmony with his theory of the case will not estop him to review his objection to the sufficiency of the evidence, both in a motion for new trial and upon appeal. Such is not the state of this record, and decision upon the question thus suggested must await the presentation of a case appropriate for its consideration.

There is no serious dispute in this case
3. TRIAL: direction of verdict: that defendant did insure the deceased; overcoming prima-facie case. that the policy or contract was in force at the time of Hatfield's death; and that, if his death was the result of "bodily injury sustained through accidental means, and resulting directly, independently and exclusively of all other causes," then the defendant is liable. Appellant has planted its defense upon a denial that such was the cause and manner of the death of the deceased, and upon an affirmation of the fact that such death was the result of disease, and not of accidental injury. Upon the trial, the plaintiff clearly made a prima-facie case for a recovery. Having done so, it is difficult to conceive how a defense resting solely upon expert opinion that the death might have been, or was in fact, the result of disease, could be made so complete and impregnable as to make the issue one of law; but be that as it may, the defendant accepted the hazard of voluntarily going to the jury upon a series of findings submitted at its request, in which all the vital propositions of fact in support of its defense were separately committed to the arbitrament of the jury. Contrary to its hopes and expectations, the jury has negatived each and every one of those propositions, and, as we have seen, it is not now competent for appellant to say that such findings are without support in the evidence. The verdict is, therefore, not vulnerable to the objection as made, and if appellant is entitled to a new

trial, it must be found in some of the other alleged errors assigned.

This conclusion renders it unnecessary for us to review many of the authorities cited to us in the briefs. We may also add that, even were we not to apply the rule of law just discussed, we should still be compelled to hold, upon the whole record, that the evidence was sufficient to take these questions to the jury, and the court did not err in so ruling.

II. In the second proposition advanced, appellant assigns error upon the ruling of the court in refusing 11 different requests for instructions to the jury, because counsel say they were correct statements of the law, and the subject matter of them was not fairly or correctly covered by any of the instructions given by the court upon its own motion.

We cannot extend this opinion to quote *in extenso* the many requests made, and, as counsel have argued them in general propositions, we will speak of them in the same manner. It may be conceded that some of them contain appropriate statements of the law applicable to the case on trial, but, on comparison of each of them with the charge as given to the jury, we find no correct rule asked for by the appellant and essential to a proper submission of the issues which is not fairly covered by or embodied in the instructions given by the court. Others of the requests refused are clearly wrong; as, for example, two of them would direct the jury that, if Hatfield's death did not occur within one year from the date of the policy, July 11, 1911, there could be no recovery, ignoring the conceded fact that the insurance contract had been extended an additional year by renewal. Others are more argumentative than otherwise, and have no appropriate place in a charge to a jury.

The general assignments of error above referred to are not sustained by the record, and must be overruled.

III.   The third proposition is that the court erred in refusing a requested instruction defining the meaning of the word "accident," as follows:

"You are instructed that an accident is defined to be the happening by chance or taking place unexpectedly, not according to the usual course of things; an event taking place without one's foresight or expectation, undesigned, sudden and unexpected. An event happening without any human agency, or, if happening through human agency, an event which, under the circumstances, is unusual and unexpected to the person to whom it happens. It is the happening of an event without the occurrence of the will by the person by whose agency it was caused; or the happening of an event without any human agency.

"The term 'accident,' used in its ordinary and popular sense, means the happening by chance; taking place unexpectedly; not according to the usual course of things, or not as expected. If an injury or death is the result of a man's intentional act, it is not an accident; but if, preceding the injury, something unforeseen, unexpected and unusual occurs which produced the injury, then the injury has resulted from accident or from accidental means.

"A person may do a certain act, the result of which may produce what is commonly called accidental injury or death, but the means are exactly what the man intended to use and did use and was prepared to use. The means were not accidental, but the result might be accidental; and, if you find that the said William J. Hatfield placed himself in a position where injury or death would follow, so long as he remained in such position and injury, and death did result by reason of such voluntary position, then this would not be an accidental injury, and you should find for the defendant."

Instead of instructing as thus requested, the court charged as follows:

"An accident is any event happening without any human agency, or, if happening through human agency, an event which, under the circumstances, is unusual and unexpected to the person to whom it happened. The happening of an event without the concurrence of the will of the person by whose agency it was caused, or the happening of an event without any human agency. And you are instructed that, if such an accident occurred to the said William J. Hatfield, and if you find that such accident was the moving or producing cause of his death, without which his death would not have occurred, and that his death resulted from said accidental cause, independent of all other causes, including diseased condition of his body, then your verdict should be for the plaintiff. But if you fail to so find, your verdict should be for the defendant."

"Accident" is one of those words which seem to be the subject of an infinite variety of definition, though the essential thought or idea thereby represented is one of the commonest and most familiar character. In its general and popular sense, no one misunderstands it, but no one seems as yet to have been able to state it in other words of such scientific or critical exactness as to command universal approval even of those who speak with authority. There are many words in everyday use among people generally, so familiar and so well known that attempts to define them in other words which shall be at once full, complete and exact, serve to cloud rather than to clarify their meaning to ordinary comprehension. This the courts have quite generally come to recognize, and it is now well settled that "accident," as used in insurance contracts, is to be given its meaning and effect as employed in general usage. Nevertheless, while conceding this to be correct, courts still persist in the effort to critically define the word,

exhausting the resources of the language in stating and re-stating the meaning of the word in ever varying forms, without advancing a pace nearer finality of definition. The precedents in which the subject is treated are too nearly numberless to justify any attempt at this time to indulge very largely in citation. The decisions, or many scores of them, are very carefully digested in 1 C. J. 390 *et seq.,* and the definition adopted by a decided majority of the courts stated as follows:

"Accident denotes an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected; chance, casualty, con-tingency, an event happening without any human agency, or, if happening through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens; something unexpectedly tak-ing place, not according to the usual course of things; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; some-thing happening by chance; a mishap."

It is enough at this time to add that the definition of "accident," as given by the trial court, or its substantial equivalent, has been often approved, and is not at variance with our own decisions. It is substantially in the lan-guage used in *McGlinchey v. Fidelity & Casualty Co.,* 80 Me. 251, and quoted approvingly by us in *Carnes v. Iowa S. T. M. Assn.,* 106 Iowa 281, 285. See, also, Bouvier's Law Dictionary, and *United States Mut. Acc. Assn. v. Barry,* 131 U. S. 100. Nor does it in any essential respect differ from the definition requested by appellant, except in the argumentative application of the rule asked for in such request. To have charged as thus asked would have been to utterly mislead the jury into the thought that, if Hat-field voluntarily undertook to drive the screw, and in so do-

ing was injured by slipping or falling upon the screw driver, then such injury was not accidentally caused, within the meaning of the policy,—a rule which, if carried to its logical extent, would render the protection of an accident insurance policy the merest farce. Practically speaking, every unexpected or unintended personal injury may be traced in some of its lines of causation to the voluntary act of the victim. For instance, he is a hunter, and is wounded or killed by the explosion of his gun; or he is a carpenter, and the ladder which he is climbing slips or breaks, precipitating him to the ground; or a woodsman, who chops down a tree which falls in an unexpected direction and crushes him; or a swimmer, who, mistaking his strength or skill, ventures too far from shore and is drowned; or a surgeon or embalmer, whose instrument slips and wounds his hand, inducing fatal blood poisoning; or any other person who voluntarily undertakes any kind of work, or mere diversion, and in so doing unexpectedly and unintentionally sets in motion some force, bringing upon himself an injury; or, by reason of some intervening unlooked-for event, such as a slip or a fall, or the breaking or the slipping of the tool with which he is employed, he is seriously hurt,—the result in each and every case would not have taken place had the person suffering the injury not voluntarily placed himself in the position where he received the harm complained of; but we think no court would for a minute give ear to the construction that such injuries are not clearly accidents, or are not caused by accidental means, within the meaning of the law and of the contract of insurance.

IV. Error is also assigned upon the the court's refusal to give an instruction to the effect that, if the jury found it "equally consistent that the death of Hatfield might have been caused by accident or might have

5. APPEAL AND
ERROR: harmless error:
jury negativing
fact on which
refused instruction is based.

been caused by disease or bodily infirmity, this would not make out a case of death through accidental means," within the meaning of the contract. In this we think the court did not err. The rule which counsel doubtless had in mind is one having its most important application to cases where there is no eyewitness of the death or injury complained of, and the truth must be arrived at by circumstantial evidence alone. The substance of the rule, so far as applicable here, was sufficiently embodied in the court's instructions upon the burden of proof and preponderance of evidence. But even if, as a technical proposition, the instruction was a proper one, its omission worked no prejudice to the appellant, because the jury, upon a question submitted at appellant's request, affirmatively found against the contention that deceased was afflicted with any disease contributing to his injury.

V. The exception taken to the order of court permitting the plaintiff to amend the petition by alleging the renewal of the insurance at the end of the first year, cannot be sustained. The omission thus cured was clearly a mere oversight, though, perhaps, a careless one. Appellant's conduct, from the first presentation of the claim, was an implied admission that the contract of insurance was still in force at the date of Hatfield's death, and that its defense, if any, was based solely on the theory that his death occurred from other than an accidental cause. Its vigorous opposition to the allowance of the amendment was, of course, within its rights; but the court was too clearly within its discretion in overruling the objection to present any debatable question. That the ruling was also manifestly in the interest of justice and fair play is seen from the fact that, when resistance to the amendment was found unavailing, and appellant was re-

6. PLEADING: amendments: permissible in order to cure careless oversight.

quired to produce its own records, the renewal of the insurance was admitted without contest.

VI.     Plaintiff put in evidence the

7. TRIAL: instructions: cautionary: limiting purpose of testimony.

correspondence between Mrs. Hatfield and the appellant, in which she asked to be furnished blanks to enable her to furnish formal proofs of the death of the insured, and appellant's refusal of her request, or to recognize any liability on account of such death.   Among appellant's requests for instructions was one to the effect that such correspondence or proofs were not to be considered as evidence to establish the facts concerning Hatfield's death, but only as bearing upon the question as to whether the required proofs were furnished, as provided by the contract.   The only professed purpose of the offer of this testimony was to show acts by the appellant constituting a waiver of the necessity of formal proofs, and we cannot assume that the jury would give to them any other effect.   If the court were required to enumerate to the jury all the things which each item of evidence does *not* tend to prove, instructions would become endless.   It may, and sometimes does, happen that certain testimony is of such character as may naturally be misapprehended by the jury, and accorded weight on questions to which it has no proper application, and in such case, a cautionary instruction as here asked would be entirely proper.   Such instructions are, however, largely within the discretion of the court, and refusal thereof is not error.

Further exception is taken to the re-

8. TRIAL: instructions: province of jury: materiality of statements of hypothetical question.

fusal of the court to charge with respect to the testimony of expert witnesses that, if the jury found that the hypothetical statements on which an expert opinion is based are, "in material and important particulars, incorrect, unfair, partial and untrue," then the answer given is entitled

to no consideration. The request embodies an erroneous proposition of law, in that it permits the jury to say what are and what are not the material and important features of the hypothesis embodied in any given interrogatory. *Ball v. Skinner*, 134 Iowa 298, 305. The request was properly refused.

VII. The contention that there was no

9. INSURANCE:
proof of loss:
waiver: evidence.

proper waiver by appellant of formal proofs of loss is not sustained by the record. It is shown without dispute that, promptly upon the death of Hatfield, his wife, in person or by attorney, notified the appellant thereof, and repeatedly asked to be furnished with the necessary blanks for proof. Appellant then referred plaintiff to its examiner at Seattle. Applying then to the examiner for the blanks on at least two occasions, they were refused, and she was pointed to the result of the post mortem examination as the reason why the appellant declined to consider the question of its liability or to comply with her request. Under such circumstances, it evidences something of hardihood for appellant, when suit is brought upon the claim, to set up a failure to furnish formal proofs as a defense to plaintiff's right of recovery. No objection was ever raised on that score when payment was demanded, but, on the contrary, the refusal of the demand was placed solely on the ground that the autopsy disclosed that the death of the deceased was the result of natural causes, and not of accident. The showing of waiver was so clear and undisputed as to admit of no question. *Bloom v. State Ins. Co.*, 94 Iowa 359, 363; *Pray v. Life Ind. & Sec. Ins. Co.*, 104 Iowa 114, 118; *Stephenson v. Bankers Life Assn.*, 108 Iowa 637; *Keane v. Century Fire Ins. Co.*, 150 Iowa 658, 664.

VIII. Next to the argument that the

10. NEW TRIAL:
newly discovered evidence:
diligence.

verdict is not supported by the evidence, the assigned error most urgently pressed upon our attention relates to the overrul-

ing of appellant's motion for a new trial. As we have be-
fore said, time seems to have been extended for such mo-
tion from the entry of judgment, on February 19, 1915, to
March 6th following. The motion then filed was based en-
tirely upon alleged errors of the trial court in its rulings
and instructions, substantially such as we have already con-
sidered. On April 3d following, an amended motion was
filed, setting up a new ground for a retrial of the case be-
cause of the claimed discovery that Maggie Bell, the maid
living with the Hatfields at the time of the death of the in-
sured, would testify to facts concerning the circumstances
of the alleged injury differing very materially from the tes-
timony given by the widow, and tending strongly to show
that deceased was not injured in the manner or to the ex-
tent claimed, and that he died from disease. The affidavits
in support of the motion were those of a Mr. Harsh, an
examiner in the employ of the insurance companies inter-
ested in the defense, and another by one of defendant's
counsel. The first affidavit states that, upon examining
into the facts and circumstances of Hatfield's death, the
examiner learned that Maggie Bell was an eyewitness of
the facts in connection with the alleged accident, and that
thereupon, he made an effort, by correspondence and by
wire and by employing assistance, and later by making a
personal trip from Des Moines to Oregon, to locate Maggie
Bell, but was unable to do so until March 20, 1915, when,
through persons at Portland, Oregon, he found that she
was living at Marshfield in that state. Thereupon, through
the assistance of others, a sworn statement by Miss Bell
was procured. He further says that, when he personally
visited Oregon, he applied to Mrs. Hatfield to ascertain
where he could find the desired witness, but the widow pro-
fessed not to know her residence or address. He then
proceeds to state what the said Maggie Bell would have
testified to, had she been a witness on the trial. Without

setting it out at length, it may be said that such evidence, if given, would have afforded material support to the theory of the defense. The affidavit of the attorney is to the effect that Mr. Harsh had been active in investigating the facts of the case for the use of the defense; that the affiant had frequent talks with Harsh concerning the whereabouts of Maggie Bell; and that he had at all times understood from Harsh that he had made diligent effort to find the said witness, but without avail until March 20, 1915; and that, until that time, he knew nothing of what such witness would testify to. He further says that he has read the original affidavit of Maggie Bell and the statements made in the affidavit by Harsh, and that he believes that, if Miss Bell were present as a witness, she would testify substantially as stated by Harsh.

In resistance to the motion for a new trial, the plaintiff presents the affidavits of Mrs. Hatfield, of two lawyers who represented her in Portland, and of one of her attorneys in charge of the litigation here. Mrs. Hatfield admits that Harsh called upon her, making inquiry generally into the circumstances of her husband's death, and, among other things, asked where Maggie Bell was to be found. In reply thereto, she told him that Maggie had gone to the home of her brother, in Norway, Oregon, but further told him she understood that the girl had left Norway, but affiant was in communication with her by letter and would soon know where she was; and if Harsh desired to know, she would then be glad to give her address. Soon thereafter, affiant did ascertain the address, but Harsh never inquired further, and, had he done so, she would have given him the information. The affidavits of the Portland attorneys state that Mr. Harsh called upon them, and that, in conversation with them, they, or one of them, informed him where Maggie Bell had gone. They further say that Harsh expressed his confidence that the companies had a

perfect defense in the testimony of the medical experts,
and said, in substance, that he did not care what Maggie
Bell or Mrs. Hatfield might say, for he did not think plain-
tiff would ever get her case to the jury. The general ef-
fect of the affidavit of plaintiff's attorney at Des Moines is
that he had several interviews with defendant's counsel,
Mr. Sullivan, about taking depositions at Portland; that
Mr. Sullivan expressed his purpose to rely wholly upon the
expert testimony of the medical witnesses, at no time men-
tioning Maggie Bell, or any desire to obtain her presence
or testimony. He further says that, pending the trial,
when, upon an amendment to the petition, defendant had
a right to a continuance, Mr. Sullivan refused to accept a
continuance, but insisted that the trial go on to a finish.
In rebuttal, the second affidavit of Harsh was submitted,
denying the statements made by Mrs. Hatfield and her Port-
land attorneys.

In denying the motion thus made and resisted, we are
very clear that the court did not abuse the discretion with
which it is vested in such matters. In so far as the affi-
davits of Harsh and Sullivan tend to show diligence in
ascertaining the location of Maggie Bell, or in obtaining
her testimony upon the trial, such alleged facts are fairly
put in issue by the affidavits filed in resistance, and the
finding of the trial court thereon has the effect and con-
clusiveness of the verdict of a jury. It seems quite in-
credible, if the strong desire to obtain this testimony was
not of later birth, that the location of the witness could
not have been discovered during the nearly two years in-
tervening between the death of Hatfield and the trial of
the case. Indeed, it is much easier to infer that, as Maggie
Bell was living in plaintiff's family at the time, and was
one of the witnesses signing the proofs of Hatfield's death,
the companies looked upon her as a witness who, if not hos-
tile to them, would at least be friendly to the plaintiff,

and were content to leave her undisturbed until the adverse result of the trial stimulated them to redoubled efforts. This thought is emphasized by the fact that appellant went to trial without application for time or motion for continuance to secure the attendance of such witness or to obtain her deposition. It is also a matter of some significance that, while the appellant claims to have possession of the affidavit or sworn statement of Maggie Bell, it was withheld from the court, and the statement of Mr. Harsh alone is relied upon for the matter which he hopes to prove by her. It is further to be said that the statements of Harsh, tending to show his diligence, are exceedingly indefinite and general, and, if we except his call upon Mrs. Hatfield, are made up of conclusions rather than of specific facts. There is no reversible error in the refusal of a new trial.

Finding no ground for disturbing the judgment appealed from, it is, therefore,—*Affirmed.*

GAYNOR, C. J., and PRESTON, J., concur.

EVANS, J., concurs in the result, but does not wish to be bound by the discussion as to the effect of requests for instructions or special findings upon the right of a party asking same to deny the sufficiency of the evidence.